NO. 25-5040

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

Cortez Braham,

Plaintiff-Appellee,

v.

National Collegiate Athletic Association,

Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

_____

**DEFENDANT-APPELLANT NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION'S OPENING BRIEF**

_____

DORSEY & WHITNEY LLP
Ben D. Kappelman
F. Matthew Ralph
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600

WILKINSON STEKLOFF LLP
Rakesh Kilaru
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4046

NAYLOR & BRASTER
JOHN M. NAYLOR
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135
Telephone: (702) 420-7000

*Attorneys for Defendant-Appellant National
Collegiate Athletic Association*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ....................................................... iv

INTRODUCTION ....................................................................... 1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................ 6

STATEMENT OF JURISDICTION ................................................ 7

STATEMENT OF ISSUES ........................................................... 7

STATEMENT OF THE CASE ....................................................... 7

    I.     NCAA Eligibility Rules Govern Who Can Compete and for How Long in College Sports ................................................. 7

    II.    Braham Completed All Seasons of Competition Under the Rules .......................................................................... 11

    III.   No NCAA Institution Was Willing to Seek a Waiver of the Five-Year Rule on Braham's Behalf ................................... 13

    IV.   Proceedings in the District Court ....................................... 14

SUMMARY OF THE ARGUMENT ............................................... 15

STANDARD OF REVIEW .......................................................... 19

ARGUMENT .......................................................................... 19

    I.     The District Court Disregarded Ninth Circuit and Other Precedent Upholding Eligibility Rules ............................... 19

         A.    This Court and Many Other Courts Have Upheld the Validity of the Eligibility Rules Against Antitrust Challenges, Either on the Grounds That Such Rules are Non-Commercial in Nature or Because Such Rules are Obviously Procompetitive ....................................... 20

B.    The District Court Erred in Concluding that *O'Bannon*, *Alston*, and Other Eligibility Cases Have Been "Rendered Moot" by Changing Market Conditions ................................... 26

II.    The District Court Correctly Found That Plaintiff Sought a Disfavored Mandatory Injunction But Then Failed to Apply Heightened Standards of Proof to Plaintiff's Motion ....................... 27

A.    Braham Failed To Demonstrate a Strong Likelihood that His Antitrust Claim Would Succeed on the Merits Because He Offered No Evidence of Anticompetitive Effects in a Relevant Market.................................................... 29

1.    The District Court's Rule of Reason Analysis Erred at Step 1 .............................................................. 30

i.    The District Court Erred When It Concluded that Braham Had Sustained His Heightened Burden to Prove the Existence of a Relevant Market ..................................................................... 31

ii.    The District Court Similarly Erred When It Failed To Require Braham to Offer Evidence of a Likely Injury to Competition........ 35

a.    The District Court Engaged in Flawed Reasoning that Has No Limiting Principle ...................................... 36

b.    The District Court Mistook the Consequences of Ineligibility as Evidence of Anticompetitive Effects ........ 39

iii.    The District Court Overlooked that Braham Failed to Show That He Suffered Antitrust Injury ................................................................... 42

2.    The District Court Disregarded or Discounted the Robust Procompetitive Justifications for Eligibility Rules like the JUCO Eligibility Bylaw.......................... 43

3.    There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the

Procompetitive Benefits of the Five-Year Rule ............ 45

B.     The District Court Erred in Ruling Braham Demonstrated
       Irreparable Harm, Especially After His Years' Long
       Delay in Filing This Action ...................................................... 48

C.     The District Court Mis-Weighed the Equities and
       Misjudged the Public Interest .................................................. 50

CONCLUSION ................................................................................................. 51

CERTIFICATE OF COMPLIANCE ....................................................... 54

CERTIFICATE OF SERVICE ............................................................... 55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFMS LLC v. UPS Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015) ............................................................ 32

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) .................................................................. 43

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ................................................................ 19

*American Ad Mgmt., Inc. v. General Tel. Co.*,
190 F.3d 1051 (9th Cir. 1999) ................................................................ 40

*Arbolida v. NCAA*,
No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025) ................. 38, 41

*Balla v. Idaho*,
29 F.4th 1019 (9th Cir. 2022) ................................................................ 27

*Bowers v. NCAA*,
9 F. Supp. 2d 460 (D.N.J. 1998) ............................................................ 24

*Bowers v NCAA*,
974 F. Supp 459 (D.N.J. 1997) .............................................................. 45

*Boyd v. NCAA*,
No. 3:25-cv-729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025) .............. 4, 43

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .............................................................................. 42

*Deesen v. Prof'l Golfers' Asso.*,
358 F.2d 165 (9th Cir. 1966) ................................................................ 36

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ................................................................ 28

*Elad v. NCAA*,
No. 25-1981 (ZNQ)(JTQ), 2025 WL 1202014
(D.N.J. July 24, 2025)...................................................................... 33, 34

iv

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................. 46

*Fieler v. Chrysler Corp.*,
    No. C 93-3797 BAC, 1994 WL 478721 (N.D. Cal. Aug. 17, 1994) ................ 40

*Fourqurean v. NCAA*,
    143 F.4th 859 (7th Cir. 2025) .................................................... *passim*

*Giles v. NCAA*,
    No. 8:25-cv-01488-JVS, ECF 13, 26 (C.D. Cal. Aug. 18, 2025)............ 4, 25, 49

*Goldstein v. NCAA*,
    No. 3:25-cv-00027-TES, 2025 WL 662809
    (M.D. Ga. Feb. 8, 2025) ........................................................ 22, 23, 32

*Hall v. NCAA*,
    985 F. Supp. 782 (N.D. Ill. 1997)...................................................... 49

*Hart v. Massanari*,
    266 F.3d 1155 (9th Cir. 2001) ......................................................... 26

*Hasz v. NCAA*,
    No. 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025).................... 21, 25

*Janjua v. Neufeld*,
    933 F.3d 1061 (9th Cir. 2019) ......................................................... 34

*Johnson v. NCAA*,
    No. CV 25-60-M-KLD, 2025 WL 1790345
    (D. Mont. June 26, 2025)........................................................ *passim*

*Jones v. NCAA*,
    392 F. Supp. 295 (D. Mass. 1975) ..................................................... 24

*K-2 Ski Co. v. Head Ski Co.*,
    467 F.2d 1087 (9th Cir. 1972) ......................................................... 30

*Klein v. City of Laguna Beach*,
    381 F. App'x 723 (9th Cir. 2010)................................................... 30, 51

*Language Line Servs. v. Language Servs. Assocs.*,
    500 Fed. Appx. 678 (9th Cir. 2012) ................................................... 27

v

*Los Angeles Memorial Coliseum Com. v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) ................................................................ 49

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ........................................................... 28, 48

*McCormack v NCAA*,
  845 F 2d 1338 (5th Cir. 1988) ................................................................ 45

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ................................................................. 40

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) (en banc) .............................................. 27

*NCAA v. Alston*,
  594 U.S. 69 (2021) ................................................................... *passim*

*NCAA v. Board of Regents*,
  468 U.S. 85 (1984) ................................................. 21, 29, 43, 45

*Newcal Indus. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................... 32

*O'Bannon v. NCAA*,
  802 F.3d 1049,1079 (9th Cir. 2015) ................................... *passim*

*Ohio v. Am. Express*,
  585 U.S. 529 (2018) ................................................... 29, 30, 31

*Ohio v. NCAA*,
  706 F.Supp.3d 583 (N.D.W.V. 2023) ............................................. 33, 34

*Osuna Sanchez v. NCAA*,
  No. 3:25-cv-62, 2025 WL 684271 (E.D. Tenn. March 3, 2025) ...................... 22

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ................................................................ 42

*Pavia v. NCAA*,
  No. 24-6153, ECF No. 21 (6th Cir. March 31, 2025) ............................ 38, 41

*Pennsylvania v. NCAA*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ................................................................ 24

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) .................................................................. 46

*Sidibe v. Sutter Health*,
    No. 12-cv-04854-LB, 2019 WL 2078788 (N.D. Cal. May 9, 2019) ............... 32

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir. 1998) ........................................................ 23, 24

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2021) ........................................................ 42

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ........................................................ 28

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...................................................... 19

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ......................................... 36

*Villegas Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ...................................................... 27

*Walker v. NCAA*,
    No. CV 25-514-JWD-EWD, 2025 WL 1901907 (July 1, 2025) ................... 49

*Western Parcel Express v. UPS of Am.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ..................................... 31, 32

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................. 16, 18, 28, 50

*Zeigler v. NCAA*,
    No. 3:25-cv-226-KAC-JEM, ECF 28 (E.D. Tenn. June 12, 2025) ............... 3, 44

**Statutes**

28 U.S.C. § 1292(a)(1) .......................................................... 7

28 U.S.C. § 1331 ................................................................... 7

**Other Authorities**

Exec. Order No. 14322, 3 CFR 35821 (July 29, 2025) ............................................. 3

Fed. R. App. P. 32(d)(2)(A) .................................................................................. 54

Fed. R. App. P. 34(a) ........................................................................................... 6

## INTRODUCTION

This case addresses the validity of eligibility rules that govern who can compete in college sports. For decades, member schools in Division I ("DI") of the National Collegiate Athletic Association ("NCAA") have established rules to ensure that college sports are played by college students. These rules cover everything from academic requirements of a minimum grade point average and required coursework, to limitations on how long student-athletes can participate in competition.

One of those rules, called the "Five-Year Rule," allows student-athletes to participate in four seasons of collegiate competition across five years of eligibility, tracking the period a student would be expected to be in college pursuing a degree. For purposes of this rule, any competition in collegiate athletics counts, whether in Division I, Divisions II or III, or two-year colleges (which are often a steppingstone to obtaining a college degree in four years). Two-year colleges are often described—including by the district court below—as "junior colleges" or "JUCOs." The aspect of the Five-Year Rule by which athletic participation at such colleges is included in the four-season and five-year limits is sometimes called the "JUCO Rule" or "JUCO Eligibility Bylaw." *See, e.g.*, 1-ER-11.

Historically, such eligibility rules have been upheld on the rare occasion where they have been challenged under the antitrust laws, and for good reason. In

addition to preserving college sports as a unique offering, these rules ensure that student-athletes across all sports in Division I can excel in athletics and academics, secure a degree, and then move on to the next phase of their lives, making way for the next group of student-athletes to have life-changing opportunities.

The plaintiff in this case, Cortez Braham, started his college football career at a JUCO in 2019, and he used up all five years of eligibility under the Five-Year Rule by 2024. Not wanting his college sports career to be over, Braham, like approximately 35 other student-athletes across the country, sued the NCAA, claiming that the NCAA's eligibility rules violate federal antitrust law. According to Braham and these other plaintiffs, eligibility rules are "anticompetitive" because they deprive ineligible students of opportunities to compete and earn money for their name, image, or likeness ("NIL").

The NCAA has prevailed in a substantial majority of these roughly 35 individual actions because the logic of the plaintiffs' position would undermine not only the specific eligibility rules they challenge but the very concept of eligibility itself. If a player's mere ineligibility to play NCAA sports is sufficient to state an antitrust claim whenever that player might otherwise earn NIL compensation by competing, then every player who becomes ineligible under any NCAA rule can invalidate that rule and obtain reinstatement. The unique "product" that the NCAA produces, competition by eligible student-athletes, would be eliminated. As a July

24, 2025 Executive Order noted, "the future of college sports is under unprecedented threat" based on "[w]aves of recent litigation" that pose "a mortal threat to most college sports" by preventing the NCAA from "maintain[ing] reasonable rules and guardrails." *See* Exec. Order No. 14322, 3 CFR 35821 (July 29, 2025); Statement of Interest of the United States at 8-9, *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, ECF 28 (E.D. Tenn. June 12, 2025) ("USA *Zeigler* Amicus") ("And eligibility rules—like the scholarship rules upheld in the *Alston* litigation –not only can enhance consumer demand—potentially leading to greater compensation—but also can enhance quality in the labor market by preserving 'the distinction between college sports and professional sports.'" (quoting *NCAA v. Alston*, 594 U.S. 69, 84 (2021)).

To date, only five federal district courts have granted injunctions, including the district from which this appeal is taken.[1] The NCAA is appealing each of those decisions. One appellate court, the only appellate court yet to render a decision, has already sided with the NCAA. *See Fourqurean v. NCAA*, 143 F.4th 859, 862 (7th Cir. 2025). One of the districts that initially granted injunctive relief in one case,

---

[1] The District of Nevada also granted an injunction in *Martinson v. NCAA*. Minutes of Proceedings at 2, No. 2:25-cv-01376-RFB-DJA, ECF 26 (D. Nev. Aug. 20, 2025).

changed course in a second case and denied injunctive relief. *See Boyd v. NCAA*, No. 3:25-cv-729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025).

Disregarding this weight of authority and ignoring the two district court precedents within the Ninth Circuit that had already denied injunctions in similar cases, *see* Order Denying Preliminary Injunction *Giles v. NCAA*, No. 8:25-cv-01488-JVS, ECF 13, 26 (C.D. Cal. Aug. 18, 2025) and *Johnson v. NCAA,* No. CV 25-60-M-KLD, 2025 WL 1790345, at *18 (D. Mont. June 26, 2025)), the district court below enjoined enforcement of the JUCO Eligibility Bylaw as to Braham. The immediate effect of this ruling is to grant Braham alone one more year of eligibility to play football in 2025. But if extended, the effect of this ruling would be to grant every DI player the right to play an additional season of DI sports for every year he or she spent playing the same sport at a JUCO. This ruling: (i) injures the student-athletes whose DI athletic scholarships and roster sports these newly eligible ex-JUCO players will take; (ii) supplants the NCAA's judgment in implementing rules that are designed to align college sports careers with college academic careers to obtain four-year degrees with the district court's judgment; and (iii) changes (albeit subtly) the college-sports product that the NCAA is trying to produce—namely, by altering the mix of DI student-athletes toward older and more experienced players who used JUCOs as a training ground for DI competition.

The district court's decision erred in the following respects:

First, the district court ignored this Court's express guidance that NCAA eligibility rules like the Five-Year Rule are either non-commercial rules that are immune from antitrust scrutiny or that, if scrutinized, easily withstand antitrust challenges. *See O'Bannon v. NCAA*, 802 F.3d 1049,1079 (9th Cir. 2015). The district court also erroneously ruled that *O'Bannon* has been "rendered moot" by the rise of "NIL compensation and changed 'market realities.'" 1-ER-10. The district court is incorrect and lacked authority to disregard this Court's precedent.

Second, although the district court ruled that Braham sought to change the status quo via a disfavored mandatory injunction and was therefore subject to an even higher standard of proof, the district court did not require Braham to meet this heightened standard. In fact, he failed to meet the standard at each of the four steps of the preliminary injunction analysis.

- The district court erroneously concluded that Braham had made a strong showing that he would likely succeed on the merits of his claim, even though: (i) Braham's antitrust claims are fundamentally flawed, and Braham failed to introduce evidence or expert testimony in support of their elements, namely, market definition or anticompetitive effects, and instead relied solely on statements in prior cases that were not binding in this proceeding; (ii) the district court rejected procompetitive justifications for the JUCO Eligibility Bylaw that have been repeatedly affirmed by courts; and (iii) the district court contravened Supreme Court precedent by dosing out small changes to the NCAA's rules to favor individual competitors;

- The district court erroneously concluded that Braham would suffer extreme and irreparable injury if he were not allowed to play college

football in the 2025-26 season, even though Braham offered no concrete evidence that (i) he would suffer any injury whatsoever by a mere delay in his playing opportunity from 2025 until the season after a final ruling on his claim (in all likelihood, 2026), and (ii) in any event, Braham's alleged loss of NIL compensation and NFL opportunity are not irreparable harm because they are compensable by money damages.

- The district court's "balance of harms" and "public interest" analyses erred by pre-deciding the merits of the case and assuming an injunction would eliminate antitrust harm while giving no weight to the injuries that an injunction will impose on eligible student-athletes, not before the Court, who will be displaced by the increased eligibility granted to Braham and, but the court's broad logic, other ex-JUCO players.

Antitrust laws are designed to protect competition that benefits consumers, not to place a judicial finger on the scale of competition to benefit individual competitors like Braham. Cases like these threaten to erase the defining feature of college sports — that it is played by athletes who are college students. The Court should promptly reverse and restore the judicial consensus upholding eligibility rules under the antitrust laws.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a) Defendant-Appellant NCAA respectfully requests oral argument. This appeal raises important issues relating to NCAA eligibility rules, and the consequences of the ruling may extend beyond the specific rules at issue in this case.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over Braham's complaint, which is a "civil action[] arising under the laws . . . of the United States." *See* 28 U.S.C. § 1331; (4-ER-897 (pleading claims under the Sherman Act)). On July 18, 2025, U.S. District Judge Miranda M. Du, entered a preliminary injunction. 1-ER-20. The NCAA timely noticed its appeal on August 8, 2025. 5-ER-1031.

This Court has jurisdiction over the NCAA's appeal from a decision granting an injunction. *See* 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.  Whether the district court erred in disregarding as moot this Court's precedent that NCAA eligibility rules such as the Five-Year Rule are non-commercial rules that do not merit condemnation under the Sherman Act;

2.  Whether the district court erred by failing to apply the heightened standard of proof that a plaintiff must meet in order to obtain a disfavored mandatory injunction.

## STATEMENT OF THE CASE

### I.  NCAA Eligibility Rules Govern Who Can Compete and for How Long in College Sports

For over a century, NCAA member schools[2] have adopted rules to govern NCAA intercollegiate athletics. 2-ER-276 ¶9. In Division I, these rules are set forth

---

[2] The NCAA is a voluntary, self-governing association of approximately 1,100 member schools spread across three autonomous divisions that administers fair and inclusive athletic competition and academic opportunities for collegiate

in the Division I Manual and organize competition for more than 180,000 student-athletes, representing approximately 350 member schools across 26 sports. 2-ER-275 ¶6. Each year, representatives of the educational institutions that compose Division I establish and adopt the rules embodied in the Division I Manual. 2-ER-276 ¶9.

Many of these rules address the benefits and services member schools may offer student-athletes ("compensation rules"). These rules, which address commercial transactions student-athletes can engage in, both with their schools and with third parties, have been litigated extensively in recent years, including in *NCAA v. Alston*, 594 U.S. 69 (2021), which applied the Sherman Act to some compensation rules.

But this case is not about compensation rules or commercial transactions. Instead, this case involves a challenge to eligibility rules, which regulate who competes, against whom they compete, and how long they can compete. *See* 4-ER-891 ¶1 (explaining Braham is bringing the action to enjoin "unlawful eligibility rules").

Bylaw 12.8, includes a provision that governs seasons of competition and years of eligibility, which provides in relevant part, as follows:

---

student-athletes. 2-ER-275 ¶5.

**Bylaw 12.8 Seasons of Competition: Five-Year Rule.** A student-athlete *shall not engage in more than four seasons of intercollegiate competition in any one sport* (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:

> **Bylaw 12.8.1 Five-Year Rule.** A student-athlete *shall complete the student-athlete's seasons of participation within five calendar years* from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

> **Bylaw 12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2) (emphasis added).

2-ER-276-277 ¶10.

The Division I Manual makes clear that this rule applies to all collegiate athletics whether a student-athlete plays for a two-year or a four-year institution, by defining "intercollegiate competition" in Bylaw 12.02.6 to occur "when a student-athlete in either a two-year or a four-year collegiate institution*"* competes in athletics. 2-ER-277 ¶11(emphasis omitted).

9

As explained by the NCAA Director of Academic and Membership Affairs in the record below, the bylaws are designed to align student-athletes' period of athletic competition with their anticipated academic achievement and progress towards a college degree. 2-ER-278 ¶14. A student-athlete's potential years of eligibility start upon full-time college enrollment, and it is expected that the period of athletic competition will align with the student-athlete successfully obtaining a baccalaureate degree. *Id.*

Collectively, the eligibility requirements promote collegiate athletics and advance the fundamental purposes of the schools the student-athletes attend. 2-ER-278-79 ¶15. The eligibility requirements also allow the NCAA member schools to provide opportunities for hundreds of thousands of student-athletes to launch their adult lives, and for new prospective student-athletes to enter the ranks after others depart, as they have done for almost 120 years. 2-ER-275 ¶6.

There are mechanisms for waivers and exceptions to these rules. For instance, to respond to the COVID-19 pandemic's unprecedented disruptive impact on collegiate athletics during the 2020-2021 academic year, the Division I Council issued a one-time COVID waiver relief policy with the result that competition during that year did not count towards a student-athlete's four seasons of competition limit and that year did not count towards their five year window of

10

eligibility, regardless of whether the student-athlete played for a non-NCAA two-year college or a four-year NCAA member school. 2-ER-280 ¶¶20-21.

## II.   Braham Completed All Seasons of Competition Under the Rules

Braham graduated from Westwood High School in Blythewood, South Carolina in May 2019.[3] 1-ER-3 (citing ECF No. 1 at 17). Braham began his college athletic career as a wide receiver in August 2019 at Hutchinson Community College ("HCC"), a JUCO. *Id.* (citing ECF No. 1 at 17; ECF No. 8 at 2). His second season at HCC (Fall 2020) was postponed to Spring 2021 due to the COVID-19 pandemic. *Id.* (citing ECF No. 1 at 17; ECF No. 8-1 at 8).

In Spring 2021, while Braham played a second season at HCC, he received a scholarship offer to transfer and play NCAA DI football at West Virginia University ("WVU"). *Id.* (citing ECF No. 1 at 17; ECF No. 8-1 at 8). However, Braham's 2.47 GPA at HCC fell short of the NCAA's 2.50 GPA requirement for JUCO transfers under the "2-4 Transfer Rule" (Bylaw 14.5.4.3(d)). *Id.* (citing ECF No. 1 at 17; ECF No. 8 at 2; ECF No. 8-5 at 2-3). Under the 2-4 Transfer Rule,[4] a

---

[3] The facts surrounding Braham's college athletic career were developed on an expedited basis and largely rest on his own statements about his education and athletic participation. Although the facts herein are not disputed for purposes of this appeal, the NCAA does not waive arguments it may have after the more complete development of the factual record on remand.

[4] Braham's motion for a preliminary injunction sought to enjoin the 2-4 Transfer GPA Rule such that the 2021-2022 season would not count against his

student-athlete transferring from a JUCO school to an NCAA DI school must have a minimum GPA of 2.50 to immediately play upon transferring. *Id.* (citing ECF No. 8-2 at 3; ECF No. 8-1 at 6). A student-athlete who transfers from one four-year institution to another must have a minimum 2.0 GPA. *Id.* Accordingly, Braham's GPA rendered him ineligible to compete at the DI level under the 2-4 Transfer Rule. *Id.* (citing ECF No. 8-1 at 8.)

Braham therefore remained at HCC in Fall 2021. 1-ER-3-4. (citing ECF No. 1 at 17-18; ECF No. 8-1 at 8; ECF No. 22 at 13). By Spring 2022, Braham had raised his GPA above 2.50. 1-ER-4. Therefore, Braham played two full seasons (one of which was waived under the NCAA's COVID-19 blanket waiver) at the JUCO level before transferring to WVU, a DI school.

In Fall 2022, Braham played for WVU for his first full NCAA season. *Id.* (citing ECF No. 1 at 18; ECF No. 8-5 at 3). In Fall 2023, Braham returned to WVU, where, due to "familial hardship[s]" he played only a partial season. *Id.* (citing ECF No. 8-5 at 3, ECF No. 1 at 18; ECF No. 8-1 at 8; ECF No. 22 at 13).

---

eligibility. 4-ER-750-753. Although the district court granted Braham's injunction, its decision did not address the 2-4 Transfer GPA Rule and instead enjoined enforcement of "the Five-Year Rule as it applies to Braham's time at junior college in connection with Braham's eligibility in the upcoming 2025-2026 football season." 1-ER-20. For the reasons noted infra, the antitrust analysis of the 2-4 Transfer GPA Rule is the same as for the Five-Year Rule. The district court erred to the extent it granted an injunction based on the 2-4 Transfer GPA Rule.

Therefore, Braham's 2023-2024 season did not count toward the NCAA's four seasons-of-competition limit.

In Fall 2024 (the 2024-2025 season), Braham transferred to the University of Nevada, Reno ("UNR"), another DI school, for his second full NCAA season. *Id.* (citing ECF No. 8-1 at 8-9; ECF No. 8-5 at 3; ECF No. 22 at 13).

At the hearing, Braham did not dispute that he used two years of eligibility at the JUCO level and three years at the DI level, maxing out his five years of eligibility. *Id.* (citing ECF No. 22 at 13). It is undisputed that absent the preliminary injunction, Braham would have exhausted his years of eligibility at the end of the 2024-2025 academic year under the NCAA Division I bylaws he challenges. 4-ER-752.

## III. No NCAA Institution Was Willing to Seek a Waiver of the Five-Year Rule on Braham's Behalf

The Five-Year Rule's application to Braham has been apparent since he first enrolled in college, and certainly by the Fall of 2022 when he first enrolled in a DI school. 3-ER-373. Further, since June 30, 2021, Braham has been at all times eligible to earn compensation for the use of his name, image, and likeness ("NIL"), regardless of whether he was enrolled at an NCAA or NJCAA member school. 2-ER-254.

Despite this, Braham took no recourse before 2025 to seek additional eligibility. Braham first asked UNR to apply for a waiver of the Five-Year Rule on

13

his behalf,[5] but UNR declined on or around February 18, 2025. 4-ER-896 ¶20. At this time, Braham was told he should "find a lawyer and file a lawsuit against the NCAA." 4-ER-896-897 ¶21. Braham waited almost three months, until May 5, 2025. 4-ER-897 ¶22. He then reached back out to UNR, who once again, denied his request. *Id.* It was only after this point that, on May 27, 2025, that Braham filed suit against the NCAA, arguing that he would be irreparably harmed if he was not afforded immediate relief. 4-ER-895 ¶16.

## IV. Proceedings in the District Court

On May 27, 2025, Braham filed a Complaint in district court against the NCAA under the Sherman Act. On June 17, 2025, Braham filed a motion to preliminarily enjoin the NCAA from enforcing (1) the Five-Year Rule (Bylaw 12.8.1); (2) the 2-4 Transfer GPA Rule (Bylaw 14.5.4.3(d)); and (3) the Rule of Restitution (Bylaw 12.11.4.2). In support of his motion, Braham offered a short declaration from himself, his attorney, and a document entitled *NIL at 3: The Annual Opendorse Report. See* 4-ER-802; 4-ER-819; 4-ER-822. Braham provided

---

[5] The reason that the NCAA accepts eligibility-waiver applications only from its member institutions and not directly from the student-athletes is twofold. First, the NCAA has direct relationships only with its members and not with any of its members' student-athletes. Second, limiting waiver applications to member institutions performs a screening function that weeds out waiver applications that lack merit. The member institutions are well situated to determine which waiver applications are meritorious. 2-ER-279 ¶19.

no evidence or expert economic analysis of the relevant markets, of harm to competition, or any other antitrust issue.

The NCAA fully filed an opposition to the motion for preliminary injunction and a declaration from an NCAA employee.

On July 2, 2025, the district court heard oral argument on the motion.

On July 18, 2025, the district court entered an order preliminarily enjoining enforcement of the challenged eligibility rules as to Braham. 1-ER-20.

On August 8, 2025, the NCAA filed a notice of appeal of the district court's order. 5-ER-1031.

## SUMMARY OF THE ARGUMENT

The district court committed two principal errors.

First, the judicial consensus, including this Court's precedent in *O'Bannon* and the Supreme Court's guidance in *Alston*, holds that eligibility rules—like the Five-Year Rule and JUCO Eligibility Bylaw at issue here—are non-commercial rules that are either not subject to scrutiny under the Sherman Act or whose validity can be upheld on a quick-look analysis. *See* Argument § I.A. Instead of coming to grips with these cases, the district court erroneously concluded that it could simply disregard them because changing market realities had rendered the cases moot. *See* Argument § I.B.

15

Second, the district court found that Braham was seeking to change the status quo via a mandatory injunction. The district court nevertheless failed to hold Braham to the heightened standards for obtaining such disfavored relief at every step of the *Winter* analysis. *See* Argument § II.

When evaluating whether Braham had demonstrated a strong likelihood of succeeding on the merits of his antitrust claim, the district court erred in applying the 3-step rule of reason analysis.

At Step 1, the district court did not require Braham to offer admissible evidence to establish either a relevant market or anticompetitive effects in that market. *See* Argument § II.A. Instead, the district court allowed Braham to rely upon the determinations of relevant markets in other cases that were not binding here under the rules of issue preclusion. *See* Argument § II.A.1.i. In doing so, the district court also disregarded that Braham's own allegations contradicted his alleged relevant market. *Id.* In evaluating anticompetitive effects, the district court also failed to require Braham to produce admissible evidence or expert testimony, instead relying on flawed logic that, because eligibility rules always exclude some competitors, then the elimination of eligibility rules will always increase the number of competitors and, therefore, competition. *See* Argument § II.A.1.ii. In doing so, the district court mistook the consequences of mere ineligibility as evidence of anticompetitive effects and overlooked that Braham failed even to

16

demonstrate antitrust injury. *Id.* The district court also ignored that the economic effect of invalidating the JUCO Eligibility Bylaw would be to increase the supply of players relative to the demand of teams and thus reduce, rather than increase, competition. *Id.*

At Step 2 of the rule of reason analysis, the NCAA sustained its burden by proffering two substantial procompetitive justifications for the Five-Year Rule and JUCO Eligibility Bylaw, based both on evidence and prior case law. *See* Argument § II.A.2. Braham offered no evidence that these justifications were insignificant or unsuited to their purported purposes. *Id.* Nevertheless, the district court rejected the NCAA's first procompetitive justification—namely that the Five-Year Rule is necessary in order to preserve college athletics as a unique offering from professional sports—based on the mere fact that the NCAA offers exceptions to the Five-Year Rule for military service, religious missions, etc. *Id.* These exceptions do not invalidate the intent or effect of the rule, and the district court erred by concluding otherwise. *Id.* The district court also erred by not even evaluating the NCAA's other procompetitive justification—namely, that the Five-Year Rule helps to align academic and athletic careers and ensure that NCAA athletes are also students progressing towards degrees. *Id.*

At Step 3, the district court did not apply the standards in *Alston* for evaluating proposed alternatives to the existing rules. *See* Argument § II.A.3.

17

Instead, the district court uncritically accepted arguments that simply invalidated the JUCO Eligibility Bylaw without requiring Braham to show that the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits" or that Braham's alternatives are "substantially less restrictive" and "virtually as effective in serving the defendant's procompetitive purposes . . . without significantly increased cost." *Id.*

When evaluating whether Braham had shown that he is likely to suffer "extreme or serious damage" that is not compensable by money damages, the district equated Braham's inability to play football this season with his inability to play football ever again. *See* Argument § II.B. The district court erred because: (1) sitting out for a year due to ineligibility is not irreparable harm; and (2) any harm that Braham may have suffered in lost NIL money and the prospects of an NFL career would be compensable by money damages because the value of such opportunities can readily be calculated.

Finally, because the district court's analysis of the first two *Winter* factors was seriously flawed, it misbalanced the equities and misjudged the public interest, concluding that Braham playing for another season would have no negative impact on the NCAA eligibility system generally or on the specific player whom Braham will inevitably displace. *See* Argument § II.C.

## STANDARD OF REVIEW

On appeal, this Court will reverse a district court's grant of a preliminary injunction if the lower court abused its discretion, if its decision is premised on an erroneous legal standard, or it made clearly erroneous findings of fact. *Am. Passage Media Corp. v. Cass Commc'ns, Inc*., 750 F.2d 1470, 1472 (9th Cir. 1985). The lower court's "interpretation of the underlying legal principles. . . is subject to de novo review." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009). A finding of fact is "clearly erroneous if it is implausible in the light of the record, viewed in its entirety, or if the record contains no evidence to support it." *Id.*

Here, the district court ignored controlling law on the validity of eligibility rules, failed to apply the heightened standard for disfavored mandatory injunctions, and ultimately purported to make numerous factual rulings without any supporting evidence.

## ARGUMENT

## I.   The District Court Disregarded Ninth Circuit and Other Precedent Upholding Eligibility Rules

In a long line of cases dating back decades, courts have consistently upheld the legitimacy of eligibility rules like those at issue here. Courts have held that these rules are not commercial in nature and not subject to the Sherman Act, or alternatively, that these rules do not restrain competition, and are in fact

procompetitive.

A.   **This Court and Many Other Courts Have Upheld the Validity of the Eligibility Rules Against Antitrust Challenges, Either on the Grounds That Such Rules are Non-Commercial in Nature or Because Such Rules are Obviously Procompetitive**

This Court has made clear that the Sherman Act only covers commercial activity, or "activity from which the actor anticipates economic gain." *O'Bannon*, 802 F.3d at 1065 (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶260b (4th ed. 2013)). The relevant threshold inquiry here is whether the Five-Year Rule is related to "the NCAA's commercial or business activities." *Id.* (quoting *Smith v. NCAA*, 139 F.3d 180, 185 (3d Cir. 1998)).

In *O'Bannon*, the plaintiffs challenged the NCAA's compensation rules, including limitations on the bundle of goods and services that member schools can provide to student-athletes. 802 F.3d at 1053, 1055-56. In analyzing these restrictions (primarily focused on the commercial use of student-athletes' NIL) under the Sherman Act, this Court did not conclude that all eligibility rules are commercial in nature and thus subject to antitrust scrutiny. Rather, this Court held only that "the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school" has an impact on commerce "because it is undeniable that both parties to that exchange anticipate economic gain from it." *Id.* at 1065. This Court refused to accept that the rules were "mere

20

'eligibility rules'" and thus exempt from the Sherman Act; but this court also did not determine (as the district court determined in this case) that all "eligibility" rules necessarily have commercial implications. *Id*. at 1065-55. To the contrary, the Court distinguished rules that "clearly regulate the terms of commercial transactions" from "a true 'eligibility' rule, ***akin to the rules limiting the number of years that student-athletes may play collegiate sports*** or requiring student-athletes to complete a certain number of credit hours each semester." *Id.* at 1066 (emphasis added).[6]

*O'Bannon* thus expressly affirmed the demarcation between commercial rules—that "clearly regulate the terms of commercial transactions" by "regulat[ing] what compensation NCAA schools may give student-athletes, and how much,"—and "true 'eligibility' rules." *Id.* The former are subject to the Sherman Act; the latter are not. *Johnson*, 2025 WL 1790345, at *9; *see also Hasz v. NCAA*, No. 8:25CV398, 2025 WL 2083853, at *4 (D. Neb. July 24, 2025)

---

[6] This distinction originated in *NCAA v. Board of Regents*, 468 U.S. 85 (1984). In *Regents*, the Court invalidated rules restricting the total number of collegiate football games that a network could televise each year. *Id.* at 91-94, 113-20. But in reaching its conclusion, the Court distinguished the rules before it from other rules, explaining in dicta that "most of the regulatory controls of the NCAA are a justifiable means of fostering competition among amateur athletic teams . . . [T]he [restraints] challenged in this case do not . . . fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture." *Id.* at 117.

("[T]here is no evidence in the present record demonstrating how the Five-Year Rule could be read as regulating compensation for student-athletes."); *Goldstein v. NCAA*, No. 3:25-cv-00027-TES, 2025 WL 662809 at *6 (M.D. Ga. Feb. 8, 2025) ("To conclude, *O'Bannon* is still good law, and although it's not binding on this Court, it's persuasive enough for the Court to follow in the absence of Eleventh Circuit precedent on this delicate and novel antitrust issue.").

*Alston*, like *O'Bannon*, did not reach "true 'eligibility' rules." As the court in the Eastern District of Tennessee explained in *Osuna Sanchez*, "*Alston* involved a challenge to NCAA rules that restricted what 'education-related benefits' colleges could provide as compensation to student-athletes. Nothing in *Alston* states that all NCAA eligibility rules are commercial in nature." *Osuna Sanchez v. NCAA*, No. 3:25-cv-62, 2025 WL 684271, at *3 (E.D. Tenn. March 3, 2025) (internal citation omitted).

Indeed, like *O'Bannon*, *Alston* involved the bundle of goods and services member schools may offer to student-athletes for their athletic services. 594 U.S. at 80. The Court tailored its decision to "compensation" rules—a term the Court repeated throughout its recitation of what the case was about. *Id.* ("compensation limits"), at 82 ("power to restrain student-athlete compensation," "compensation limits," allegedly "cap artificially the compensation offered to recruits," "terms of the compensation"), at 83 ("compensation restrictions," "challenged compensation

rules," "new types of compensation"), at 84 (district court "rejected the student-athletes' challenge to NCAA rules that … restrict compensation and benefits unrelated to education," "Nothing in the order precluded the NCAA from continuing to fix compensation and benefits unrelated to education"). The Supreme Court's ensuing analysis related exclusively to "compensation restrictions." *Id.* at 87.

Justice Kavanaugh's concurrence likewise took great care to emphasize that *Alston* "involves only a narrow subset of the NCAA's compensation rules," *id.* at 108, and "[e]veryone agrees that the NCAA can require student athletes to be enrolled students in good standing," *id.* at 110 (Kavanaugh, J., concurring). *Alston* simply did not address "true 'eligibility' rules;" and accordingly did not disturb prior cases that analyzed whether such rules are commercial in nature and subject to the Sherman Act. Put simply, "[a]s *O'Bannon* instructs, the Challenged Rules are true eligibility rules and nothing in *Alston* changes that." *Johnson*, 2025 WL 1790345, at *10; *see also Goldstein*, 2025 WL 662809 at *4 ("*Alston* is more scalpel than ax").

The Third Circuit has likewise concluded that the NCAA's eligibility rules are "not related to the NCAA's commercial or business activities," because "eligibility rules primarily seek to ensure fair competition in intercollegiate athletics." *Smith v. NCAA*, 139 F.3d 180, 185 (3d Cir. 1998), vacated in part on

other grounds, 525 U.S. 459 (1999). In that case, a student-athlete challenged enforcement of the NCAA bylaw restricting postgraduate athletic participation. *Id.* at 185-86. The court reasoned that the bylaw is not related to the NCAA's commercial activities and therefore concluded that "the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements." *Id.* at 186.

District courts have also rejected arguments that all NCAA eligibility rules are commercial in nature. In *Gaines v. NCAA*, the district court concluded that NCAA eligibility rules related to entering a professional sports draft or being represented by an agent are not subject to Sherman Act scrutiny because the "overriding purpose of the eligibility Rules … is not to provide the NCAA with commercial advantage, but rather the opposite extreme — to prevent. . . destroying the unique 'product' of NCAA college football. . . [and] preserve the unique atmosphere of competition between 'student-athletes.'" 746 F. Supp. 738, 744 (M.D. Tenn. 1990); *see also Pennsylvania v. NCAA*, 948 F. Supp. 2d 416, 426-28 (M.D. Pa. 2013) (scholarship limits did not render enforcement sanctions to be commercial activity under the Sherman Act despite scholarship rules being deemed commercial activity in other contexts); *Bowers v. NCAA*, 9 F. Supp. 2d 460, 497-98 (D.N.J. 1998) (finding the NCAA's academic requirements to play football were eligibility rules and not subject to antitrust scrutiny); *Jones v. NCAA*, 392 F.

Supp. 295, 303 (D. Mass. 1975) (holding antitrust laws did not apply to eligibility rules governing pay for play).

In recent cases similar to this one, including a case from the District of Montana, other district courts have routinely rejected the district court's conclusion that all NCAA eligibility rules are necessarily commercial. *See Giles*, ECF 26 at 9 ("[O]nly compensation rules regulate commercial activity and are subject to the antitrust laws. True eligibility rules, contrarily, do not regulate commercial activity.") (citing *O'Bannon*, 802 F.3d at 1065-66); *Johnson*, 2025 WL 1790345, at *10 ("Because the Challenged Rules are true eligibility rules, they are not commercial in nature and are not subject to antitrust scrutiny under the Sherman Act."); *Hasz*, 2025 WL 2083853, at *4 ("Although the Five-Year Rule has an incidental effect on Hasz's ability to earn NIL money by preventing him from playing an additional season, it does not directly regulate commercial activity. Rather, it dictates who can play college sports and for how long.").

This Court, and most courts to have considered the issue, have concluded that eligibility rules like the Five-Year Rule or JUCO Eligibility Bylaw are non-commercial.[7] Such rules are either not subject to the Sherman Act or may be approved under the Sherman Act based upon a quick look analysis.

---

[7] The 2-4 Transfer GPA Rule that the district court did not address is likewise a non-commercial eligibility rule.

**B.** **The District Court Erred in Concluding that *O'Bannon*, *Alston*, and Other Eligibility Cases Have Been "Rendered Moot" by Changing Market Conditions**

The district court below acknowledged *O'Bannon's* and *Alston's* guidance on eligibility rules but did not follow it. The extent of the district court's reasoning for this departure was its determination that "in a post-*Alston* world of NIL compensation and changed 'market realities,' *O'Bannon*'s classification of NCAA eligibility rules as 'noncommercial,'…is rendered moot." 1-ER-10.

The district court erred because it lacked authority to disregard prevailing case law based on its own view of changed circumstances—especially changed circumstances that were merely alleged and not proven by any evidence. This Court and district courts adhere to the axiomatic principle that district courts must follow the precedent of the court of appeals. *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("A district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue, or with Supreme Court Justices writing for a majority of the Court."). As this Court has explained, "caselaw on point *is* the law. . . Binding authority must be followed unless and until overruled by a body competent to do so." *Id.* This principle does not permit a district court to cast aside this Court's precedent as "rendered moot" based on its perceived "changed market realities," as the district court did in its analysis of *O'Bannon*. *See* 1-ER-10.

This principle underlies the orderly functioning of the judicial system. This Court similarly has recognized that it must follow its own precedent absent a contrary ruling from the United States Supreme Court, or unless this Court sits en banc to review and overrule its own precedent. *See Balla v. Idaho*, 29 F.4th 1019, 1028 (9th Cir. 2022) ("We are bound by the law of our circuit, and only an en banc court or the U.S. Supreme Court can overrule a prior panel decision."); *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (absent an en banc court, this circuit can overrule prior precedent only if a subsequent Supreme Court decision is "clearly irreconcilable" with the "theory or reasoning underlying the prior circuit precedent").

## II. The District Court Correctly Found That Plaintiff Sought a Disfavored Mandatory Injunction But Then Failed to Apply Heightened Standards of Proof to Plaintiff's Motion

A preliminary injunction is designed to "preserve[] the status quo and prevent[] irreparable loss of rights before judgment." *Language Line Servs. v. Language Servs. Assocs.*, 500 Fed. Appx. 678, 682 (9th Cir. 2012) (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)). An injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

To qualify for a preliminary injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent an injunction; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

Preliminary injunctions may be mandatory or prohibitory. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). "A prohibitory injunction preserves the status quo. A mandatory injunction 'goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)). "When a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting same). "The standard for issuing a mandatory preliminary injunction is high." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation and internal quotation marks omitted).

Braham conceded, and the district court agreed, that he sought a mandatory injunction. 1-ER-8; 2-ER-100; *accord Johnson*, 2025 WL 1790345, at *7. The

district court nevertheless failed to apply the relevant heightened standard to Braham's motion.

### A.    Braham Failed To Demonstrate a Strong Likelihood that His Antitrust Claim Would Succeed on the Merits Because He Offered No Evidence of Anticompetitive Effects in a Relevant Market

The threshold issue of antitrust analysis is whether the challenged conduct must be evaluated under the *per se* standard or rule of reason standard. *Per se* analysis applies only to a limited set of "horizontal agreements"—i.e., agreements between competitors at the same level of distribution—that the courts have determined through long experience "always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express*, 585 U.S. 529, 540-41 (2018). Rule of reason analysis applies to every other type of restraint, and it requires courts to conduct a fact-specific assessment of market structure, market power, and actual effects on competition to determine whether the restraint is unreasonable. *Id.* Below, Braham focused on the rule of reason analysis because it is the proper framework for NCAA rules subject to antitrust scrutiny. 2-ER-136 ("The rule of reason analysis and its three-prong burden shifting test applies[.]"); *Alston*, 594 U.S. at 92-95; *NCAA v. Board of Regents*, 468 U.S. 85, 103, 117 (1984).

Applying the rule of reason is a three-step, burden shifting exercise. *Am. Express*, 585 U.S. at 541. "Under this framework, the plaintiff has the initial

burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Thus, Step 1 of the rule of reason analysis requires a fact-specific assessment of market structure, market power, and actual effects on competition to assess anticompetitive effects. *Id.*

If the plaintiff carries his burden at Step 1, then the burden shifts to the defendant at Step 2 to show a procompetitive rationale for the restraint. *Id.* at 542. If the defendant makes this showing at Step 2, then the burden shifts back to the plaintiff at Step 3 to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* The district court did not hold Braham to his burdens and erred in its judgment of the procompetitive rationales supporting the Five-Year Rule.

### 1. The District Court's Rule of Reason Analysis Erred at Step 1

"Likelihood of success on the merits must be based on admissible evidence in the record, rather than surmise or speculation concerning what evidence could be produced at trial." *Klein v. City of Laguna Beach*, 381 F. App'x 723, 726 (9th Cir. 2010). General assertions made in a complaint are not enough. *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1089 (9th Cir. 1972).

Braham's obligation to present evidence of substantial anticompetitive effects at Step 1 of the rule of reason analysis "is no slight burden." *Alston*, 594 U.S. at 97. *Alston* noted that "courts have disposed of nearly all rule of reason

cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect"—in fact, "courts have decided 90% (809 of 897) on this ground." *Id.* (internal citation and quotation marks omitted).

The district court should have concluded that Braham's claim fails at this initial step because Braham presented no evidence of the relevant market and no evidence about any substantial anticompetitive effect caused by the Five-Year Rule or JUCO Eligibility Bylaw in that unsubstantiated market. Instead, the District Court found that Braham had met his burden at Step 1 by citing non-binding cases and without presenting evidence. 1-ER-12.

### i. The District Court Erred When It Concluded that Braham Had Sustained His Heightened Burden to Prove the Existence of a Relevant Market

Before a court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express Co.*, 585 U.S. at 542 (cleaned up). Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (emphasis added).

Market definition has two components: a product or service component and a geographic component. *Western Parcel Express v. UPS of Am.*, 65 F. Supp. 2d 1052, 1058 (N.D. Cal. 1998) (citing *United States v. Grinnell*, 384 U.S. 563, 575-76 (1966)). Defining a relevant market involves such considerations as "the reasonable interchangeability of use or the cross-elasticity of demand between the

31

product itself and substitutes for it," *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1077 (C.D. Cal. 2015) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)), and the "area of effective competition where buyers can turn for alternate sources of supply." *Western Parcel*, 65 F. Supp. 2d at 1058 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.,* 924 F.2d 1484, 1489 (9th Cir. 1991)).

The validity of a proposed relevant market is a factual determination. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). As a practical matter, economists are typically necessary "to explain the relevant market and to measure the impact of the allegedly illegal conduct." *Western Parcel*, 65 F. Supp. 2d at 1058; *see also Sidibe v. Sutter Health*, No. 12-cv-04854-LB, 2019 WL 2078788, at *26-27 (N.D. Cal. May 9, 2019); *Goldstein*, 2025 WL 662809, at *5.

In the district court below, Braham merely asserted—without expert testimony or even any supporting evidence—the existence of two different relevant markets: (1) a labor market of football players, and (2) a consumer market for watching college football games.

As to the alleged labor market, Braham did not offer any evidence showing a product market limited to NCAA DI football players. In fact, Braham's own allegations undercut any market definition limited to NCAA DI. Braham himself formerly competed for two years at a community college, 2-ER-281-282 ¶24, which indicated that Braham had once chosen community college as an alternative

32

market to NCAA DI for his own football skills. Braham is also now eligible to declare for the NFL draft or play in other professional football leagues, so he is able to choose between NCAA DI and alternative professional opportunities. 2-ER-282 ¶25. These facts imply that college football players can choose between NCAA and non-NCAA collegiate institutions and between the NCAA and professional leagues. The appropriate market definition should account for these alternate venues for NCAA student-athletes' labor and the substitution that takes place between them.

The district court nevertheless "agree[d] with Braham that the relevant market is NCAA DI college football" because three other courts had allegedly defined such an antitrust market. 1-ER-11-12 (citing *Alston*, 594 U.S. at 90; *Ohio v. NCAA*, 706 F.Supp.3d 583, 592 (N.D.W.V. 2023); and *Elad v. NCAA*, No. 25-1981 (ZNQ)(JTQ), 2025 WL 1202014, at *2(D.N.J. July 24, 2025). But the district court erred in two respects.

First, the district court contradicted itself when it concluded, on one hand, that *Alston* had changed market realities, but that *Alston's* definition of a relevant market could be adopted wholesale without examining the new market realities existing now. *Alston* itself notes that the rule of reason "analysis generally requires a court to 'conduct a fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'" 594

U.S. at 81 (quoting *Am. Express*). If *Alston* created new market realities, then *Alston's* market definition cannot be uncritically adopted in new cases.

Second, the district court erred by adopting market definitions from other cases that were not binding on the NCAA. The doctrine that determines whether an issue decided in a prior case is binding on a party to a subsequent case is issue preclusion. When an issue is not actually litigated and ultimately decided in a prior case, it is not binding in a subsequent case. *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019). Here, the NCAA is not bound by the market definition in *Alston* because, in *Alston*, the court found that the market-definition issue was admitted. *Alston*, 594 U.S. at 86. Likewise, the NCAA is not bound by the market definition in *Ohio* or *Elad,* because those cases were merely rulings on motions for preliminary injunction, and the market-definition issue was not ultimately decided in either case. *Ohio*, 706 F. Supp. 3d at 602; *Elad*, 2025 WL 1202014, at *11.

The district court here committed the same error that the Seventh Circuit corrected in *Fourqurean*—namely, relying on case law rather than facts to define the relevant market. The district court in *Ohio* held that *Alston* had already established the relevant antitrust market, but the Seventh Circuit held that this reading of *Alston* "overstates the scope of the Court's ruling" because "[t]he *Alston* Court did not decide the question of market definition." *Fourqurean*, 143 F.4th at 870 (citing *Alston*, 594 U.S. at 81). The Seventh Circuit continued: "We are also

cognizant that '[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities.'" *Id.* (quoting *Alston*, 594 U.S. at 93). The Seventh Circuit noted that, since "[t]he market realities for college sports have changed in the four years since *Alston*,"[8] a new assessment of market facts was necessary.[9] *Id.*

Here, the district court erred by not requiring Braham to demonstrate a likely relevant market by reference to current facts. To the extent the district court purported to make factual findings that NCAA DI college football is "the sole pathway to NFL opportunities" and "provides unique benefits, including NIL compensation, which are not available elsewhere," 1-ER-12, it committed clear error because the record does not support such sweeping statements.

### ii. The District Court Similarly Erred When It Failed To Require Braham to Offer Evidence of a Likely Injury to Competition

The district court concluded that Braham had met his burden to demonstrate likely anticompetitive effects in the market for NCAA DI college football because

---

[8] The district court erred when it concluded that changing market realities rendered *Alston* moot; instead, the changing market realities require that the facts underlying new claims post-*Alston* must be assessed on a fresh factual record.

[9] The Seventh Circuit also held that the district court had erred by relying on the "sparse and conclusory" market-definition allegations in Fourqurean's complaint because "[t]he preliminary injunction inquiry . . . is a decidedly far more searching inquiry than the question of whether a complaint properly alleges a claim for relief." *Id.* (quotation marks omitted).

Braham had asserted in his motion that "limit[ing] the amount of time [JUCO] athletes may play DI football because they have chosen to attend a non-NCAA institution before transferring to a DI NCAA college . . . directly harms consumers (i.e., football players) in the relevant market by preventing access to NIL benefits." 1-ER-12 (citing ECF No. 8-1 at 11-13).

The district court committed two types of error here: conceptual errors and factual errors.

### a. The District Court Engaged in Flawed Reasoning that Has No Limiting Principle

Different types of athletic competition create product variety, enhance consumer choice, and ultimately increase output—whether it is NCAA men's college football, women's professional basketball (WNBA), the Paralympics, or age-based sports (like Little League or the Senior PGA Tour). These types of organizations derive their value precisely from exhibiting competition that is limited to certain classes of people. *See e.g.*, *Deesen v. Prof'l Golfers' Asso.*, 358 F.2d 165, 172 (9th Cir. 1966); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1122-23 (E.D. Cal. 2002). If the ability of entities like the NCAA to offer a differentiated type of competition is eliminated, then competition and competitive opportunities suffer as a whole.

The district court erred because it failed to appreciate the interdependent relationship between upstream eligibility rules for players (i.e. inputs) and the

36

downstream sports competitions between teams of those players (i.e. products).

Eligibility rules upstream define the type of sports competition that is being

produced downstream. Eligibility rules thus create the parameters for upstream

competition to supply inputs for the downstream "product" of athletic competition.

The proper antitrust analysis of upstream competition is to ask whether the

competition that takes place among *eligible* players to provide labor for the defined

product has been reduced by a particular practice (*e.g.*, whether rules bar schools

from paying student-athletes).

It is not a proper antitrust analysis to do what the district court did, namely,

to ask simply whether the pool of eligible players can be increased by expanding

eligibility or reducing ineligibility (in whole or in part) and then concluding that a

larger number of eligible players necessarily increases a relevant type of

competition.

First, reducing ineligibility will always, by definition, increase the pool of

eligible players. This is the type of "circular reasoning" that the district court

purported to criticize (1-ER-12) and the reason why the district court's opinion has

no limiting principle. If applied rigorously, it would eliminate all eligibility rules.

For this reason, many other associations of colleges and universities have lent

support to the NCAA in these cases:

> If affirmed, the court's injunction jeopardizes the NCAA's ability to
> effectively set and enforce nationwide eligibility rules for
> intercollegiate athletics...A patchwork of ad hoc rule adjustments and

37

> waivers granted by judges around the country—rather than by
> athletics conferences or the NCAA—will replace a nationwide system
> developed and implemented by the schools and their membership
> organizations. Federal courts will effectively become courts of
> appeals for the NCAA—often reviewing cases, as here, in an
> emergent posture on an underdeveloped record.

Brief Amicus Curiae of American Counsel on Education, et al. at 6, *Pavia v.*

*NCAA*, No. 24-6153, ECF No. 21 (6th Cir. March 31, 2025).

Second, the mere increase in the number of competitors does not necessarily

imply an increase in competition in the relevant economic sense. *See Fourqurean*

*v. NCAA*, 143 F.4th at 870-71 (plaintiff's theory of harm made no sense, because

"[u]nder ordinary principles of supply and demand, a restraint that limits the

supply of workers in a labor market would increase, not decrease, worker

compensation")*; Arbolida v. NCAA*, No. 25-2079-JWB, 2025 WL 579830, at *3

(D. Kan. Feb. 21, 2025) (finding the current eligibility rules "limit the total

potential supply" but "seem to increase competition among the NCAA member

institutions . . . for the limited supply of potential labor").

Third, changing eligibility rules upstream necessarily changes the

competitive product being created downstream. Football performed by athletes

who are not also college students is not "college football." Courts and antitrust law

do not exist for the purpose of deciding what types of products commercial actors

must produce.

To analogize, a manufacturer (like the NCAA) is not required to change its

product merely to create opportunities for would-be suppliers (ex-JUCO players

like Braham). Here, the NCAA has determined that only student-athletes who satisfy the Five-Year Rule and JUCO Eligibility Bylaw can produce NCAA sports, and the NCAA's decision is not "anticompetitive" just because some people do not meet, or no longer meet, the student-athlete eligibility requirements. If eligibility rules are subjected to antitrust scrutiny, such rules will virtually always survive antitrust challenge because their robust procompetitive justifications outweigh their anticompetitive effects (if any). Therefore, the district court erred when it re-wrote the NCAA's eligibility rules to give one player more eligibility.

### b. The District Court Mistook the Consequences of Ineligibility as Evidence of Anticompetitive Effects

The district court found that, by "excluding a qualified cohort—namely, JUCO athletes," the JUCO Eligibility Bylaw "harms competition."[10] But the district court mistook the consequence of ineligibility (i.e., loss of NIL opportunities) as the result of a restriction of protectible competition, not merely as a necessary consequence of having eligibility rules that define a product.

The JUCO Eligibility Bylaw and Five-Year Rule do not injure competition among football players for spots on DI teams by excluding Braham personally, and Braham does not show otherwise. Braham is merely one player among thousands.

---

[10] The analysis that follows is the same for the JUCO Eligibility Bylaw, Five-Year Rule, and 2-4 Transfer GPA Rule.

His presence or absence in the pool of potentially eligible players has no impact on the degree of competition for scholarships or roster spots. Harm to Braham is not harm to competition. The Sherman Act protects "competition, not competitors." *American Ad Mgmt., Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Brown Shoe*, 370 U.S. at 344). "The elimination of a single competitor, without more, does not prove anticompetitive effect." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988).

Nor do the JUCO Eligibility Bylaw or Five-Year Rule injure competition among football players by excluding a whole cohort of players who, like Braham, are no longer eligible. The outgoing set of now-ineligible players will be replaced by an incoming set of eligible players entering those DI programs, and the level of competition will remain the same. A firm's decision to change suppliers may injure some suppliers, but it does not injure competition. *Fieler v. Chrysler Corp.*, No. C 93-3797 BAC, 1994 WL 478721, at *2 (N.D. Cal. Aug. 17, 1994) ("The replacement of one supplier by another, even if financially harmful to the former supplier, does not constitute antitrust injury.").

The district court reasoned that the JUCO Eligibility Bylaw is anticompetitive because it imposes a limit on the supply of ex-JUCO players to NCAA DI, and, therefore, the elimination of the Bylaw would be procompetitive because it would increase the number of eligible student-athletes. But this

40

reasoning is contrary to basic economics. The effect of the JUCO Eligibility Bylaw is to limit the number of ex-JUCO athletes who can participate in NCAA DI college football, while leaving the number of NCAA DI member schools the same. The district court's ruling will increase the supply of players relative to the demand for them. When supply increases relative to demand, prices tend to fall—because there is less demand-side competition relative to supply. The JUCO Eligibility Bylaw thus tends to increase competition among member schools for eligible student-athletes. *See Fourqurean*, 143 F4th at 870-71; *Johnson*, 2025 WL 1790345, at *14; *Arbolida*, 2025 WL 579830, at *3.

The JUCO Eligibility Bylaw is not a competition-reducing restraint by which NCAA schools cause anticompetitive effects—like producing less college football or paying players less money.[11] *See Fourqurean*, 143 F.4th at 870. Braham does not allege that the JUCO Eligibility Bylaw ever deprived players of the opportunity, during their periods of eligibility, from competing for DI opportunities. Nor does Braham allege that the Bylaw prevented DI schools from competing for the services of eligible players. The only alleged injury is that, by

---

[11] The district court, citing *Pavia*, also held that effects like giving a "competitive advantage of NCAA Division I member schools over junior colleges" resulted in disparate treatment" and a "distortion of the labor market." 1-ER-12. But neither the district court nor *Pavia* cited any authority for the proposition that these types of effects are recognized as anticompetitive effects under the Sherman Act.

41

virtue of their loss of eligibility, players like Braham have lost an opportunity to play a fifth (or sixth, etc.) season and thus earn NIL money. This is an injury that arises from the definition of "college football," not an injury that arises from any actual or intended reduction in competition among players or schools.

### iii. The District Court Overlooked that Braham Failed to Show That He Suffered Antitrust Injury

Braham failed to prove anticompetitive effects, but even if he had, he also failed to show antitrust injury. This is not the same thing as injury-in-fact. Antitrust injury is a personal injury that arises from a reduction in competition that the antitrust laws were designed to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Braham's injury arises because he is no longer eligible to play. His injury does not arise because the JUCO Eligibility Bylaw harmed a type of competition that the antitrust laws were designed to protect. Braham, therefore, has not suffered the requisite antitrust injury. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."); *Somers v. Apple, Inc.*, 729 F.3d 953, 967 (9th Cir. 2021) (same).

42

> **2. The District Court Disregarded or Discounted the Robust Procompetitive Justifications for Eligibility Rules like the JUCO Eligibility Bylaw**

At Step 2 of the rule of reason analysis, a defendant has the burden to demonstrate that its conduct is supported by substantial procompetitive effects. The NCAA proffered two interrelated procompetitive rationales for its eligibility rules.[12]

First, the NCAA proffered evidence that eligibility rules are procompetitive because they preserve college athletics as a unique offering from professional sports. 2-ER-276 ¶9; 2-ER-279 ¶16. Numerous courts have acknowledged the validity of this purpose. *Agnew v. NCAA*, 683 F.3d 328, 342–43 (7th Cir. 2012) ("Most – if not all – eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations" because those regulations "in college [sports]" are "necessary for the product to exist."); *see also Alston*, 594 U.S. 69 at 70; *Board of Regents*, 468 U.S. 85, 101 (1984)*; Johnson*, 2025 WL 1790345, at *14 ("While the availability of NIL compensation has without question changed the landscape of college athletics, those changes do not mean that there is no procompetitive rationale for the NCAA's eligibility rules."); *Boyd*, 2025 WL 2432200, at *7 (endorsing the NCAA's procompetitive rationales

---

[12] The NCAA also offered a specific justification for its 2-4 Transfer GPA Rule that the district court did not consider. 2-ER-278-279 ¶15.

of enhancing output by creating opportunities for "high school senior student-athletes," preserving college sports "as a product different from professional athletics," and fostering "better alignment between Division I athletics and academics"); USA *Zeigler* Amicus at 9 ("It takes no great leap of logic to see how rules tying eligibility to education-related requirements" could "preserve the unique nature of [the NCAA's] product.").

In opposition, Braham offered no evidence that the Five-Year Rule was inconsistent with the purpose of preserving college football as a unique offering compared to professional football. Nor did Braham offer evidence that this putative purpose was really a pretext designed to hide a secret intent to injure ex-JUCO students. Nevertheless, the district court rejected this procompetitive rationale as not compelling simply because the Five-Year Rule has exceptions that allow for older students to join NCAA DI football programs after prep school, military service, and/or religious obligations. 1-ER-13. Every rule has exceptions—the existence of exceptions does not automatically undermine the justification or effectiveness of a rule. The district court did not cite evidence or make findings that, in terms of numbers of student-athletes affected, these exceptions swallow the Five-Year Rule or have an effect as significant as the JUCO Eligibility Bylaw at issue here. The NCAA, not the district court, is the party best situated to craft

eligibility rules that are fair to 500,000 student-athletes while also serving the NCAA's purposes.

Second, the NCAA proffered evidence that the Five-Year Rule and JUCO Eligibility Bylaw are motivated by the concept that . . . the length of time that the student should be permitted to participate in intercollegiate athletics" should bear a relationship to the "four years are needed to complete an undergraduate education or to earn a baccalaureate degree" at an NCAA member institution. 2-ER-278 ¶14. This rationale has also been approved by courts as procompetitive. *See Johnson*, 2025 WL 1790345 at *15; *McCormack v NCAA*, 845 F 2d 1338, 1344-45 (5th Cir. 1988); *Bowers v NCAA*, 974 F. Supp 459, 461 (D.N.J. 1997).

The district court did not even analyze, much less rebut, this procompetitive justification of the Five-Year Rule and JUCO Eligibility Bylaw.

### 3. There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule

*Alston* underscored that the antitrust laws are not a tool to routinely second-guess NCAA rules:

> [C]ourts should not second-guess degrees of reasonable necessity so that the lawfulness of conduct turns upon judgments of degrees of efficiency. That would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements. And judicial acceptance of such imaginings would risk interfering with the legitimate objectives at issue without adding that much to competition.

594 U.S. at 98 (cleaned up); *Board of Regents*, 469 U.S. at 120 (NCAA needs

"ample latitude" to play its role); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport").

Therefore, at Step 3 of the rule of reason analysis, Braham bore a heavy burden to demonstrate that (1) the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits," *Alston*, 594 U.S. at 101 (cleaned up), and (2) Braham's alternatives are "substantially less restrictive" and "virtually as effective in serving the defendant's procompetitive purposes" "without significantly increased cost." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (quoting *O'Bannon*, 802 F. 3d at 1070) (cleaned up).

The district court accepted three of Braham's proposed alternatives—"i.e., to not count JUCO-level seasons of competition toward the eligibility clock at the DI level, to provide JUCO transfer students with an extra year of eligibility, or to change the definition of 'intercollegiate competition'" to exclude JUCOS. 1-ER-15. But the district court erred because these alternatives do not meet the stringent standards at Step 3 of the Rule of Reason analysis.

Braham failed to meet either of these high standards. First, the Five-Year Rule is not "patently and inexplicably stricter than is necessary to achieve [its]

46

procompetitive benefits" because it ensures that all NCAA DI student-athletes, regardless of whether they avail themselves of JUCO competition or not, must complete their college sports careers within 4-5 years. The district court erred by failing to apply this standard.

Second, to not count two seasons of JUCO competition toward the limit of four NCAA DI seasons of competition would mean that the typical collegiate career of ex-JUCO athletes would increase 50%, from four years to six years, in comparison to student-athletes who went straight to NCAA DI.[13] An increase of even one year would amount to a 25% difference. This is not "substantially less restrictive" and "virtually as effective in serving the defendant's procompetitive purposes."

The district court also reasoned that "the structural exclusion of JUCO players is plainly unfair in that it restricts the number of years athletes have to compete for such opportunities." 1-ER-15. But the district court simply failed to consider perspectives other than that of Braham. Braham, like many aspiring professional athletes, *chose* to attend a JUCO and used it as a training ground and springboard for an NCAA DI career, even though Braham knew or had reason to

---

[13] To not count two JUCO seasons toward the limit of five seasons of eligibility, NCAA DI seasons of eligibility would entail that the eligibility clock of typical ex-JUCO athletes would increase 40%, from five years to seven years, in comparison to athletes who went straight into NCAA DI.

47

know that JUCO competition would count toward the Five-Year Rule. Allowing

Braham to play two extra DI seasons will be unfair to numerous other student-

athletes. Consider all of the DI football players who chose *not* to spend two extra

seasons improving their skills at JUCOs before transferring to DI like Braham

did—these student-athletes will have legitimate grievances that Braham received a

better opportunity than they did. Consider the plight of the eligible player whose

scholarship and roster spot will be taken by Braham with his newly acquired extra

eligibility—this player will suffer the same irreparable harm that Braham claims

entitles him to extraordinary relief.

### B.  The District Court Erred in Ruling Braham Demonstrated Irreparable Harm, Especially After His Years' Long Delay in Filing This Action

The district court found that "the denial of the opportunity to play sports is

irreparable harm" and that Braham faced irreparable harm because, absent an

injunction, he would be denied an opportunity to play NCAA DI football in 2025.

But the district court did not correctly assess the facts or apply the relevant legal

standard.

A movant seeking a disfavored mandatory injunction like Braham must

demonstrate that he is likely to suffer "extreme or very serious damage" that is not

capable of compensation in damages. *Marlyn Nutraceuticals*, 571 F.3d at 879.

What was at stake in Braham's motion was not his permanent eligibility to play

48

another season of NCAA DI football—it was merely his eligibility to play NCAA DI football in 2025. The district court erred because sitting out for a year due to ineligibility is not irreparable harm. *See Hall v. NCAA*, 985 F. Supp. 782, 800-01 (N.D. Ill. 1997).

Further, any harm that Braham suffered was compensable by money damages because it consisted of lost NIL money and the prospects of an NFL career. 1-ER-16. These are opportunities whose value can readily be calculated. The district court itself noted that Braham's NIL opportunity was allegedly worth $500,000, and the value of an NFL career can be estimated from salary and career-length information. *Id*. Such injuries are not irreparable harm. *Los Angeles Memorial Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

Braham's allegations of irreparable harm were also undercut by his delay in seeking relief. Although Braham knew or had reason to know years ago that his eligibility would end at the conclusion of the 2024 season, he waited until the eve of the 2025 season to bring this motion. This "excessively long and unjustified" delay in seeking relief is grounds for denying his motion. *See Walker v. NCAA*, No. CV 25-514-JWD-EWD, 2025 WL 1901907, at *7 (July 1, 2025) (denying former JUCO athlete's motion for preliminary injunction); *see also Giles*, ECF 13 at 3 (delay in moving for preliminary injunction a ground for denying relief).

**C.** **The District Court Mis-Weighed the Equities and Misjudged the Public Interest**

The NCAA argued below that the balance of harms and public interest tips against Braham for two reasons.

First, the NCAA argued below that the harm Braham would suffer personally is small in comparison to the adverse impact on all NCAA DI student-athletes of a precedent invalidating the JUCO Eligibility Bylaw. The district court rejected this argument on the supposition that, since its invalidation of the JUCO Eligibility Bylaw would correct anticompetitive harm, it was not a harm that could be placed in the scale. 1-ER-19. But this ruling begged the question. The district court erred by assuming that its provisional assessment of the merits was a final, correct ruling for purposes of *Winter* factors three and four.

Second, the NCAA argued below that, even if Braham's harm were balanced only against the adverse impact on the student-athlete whose scholarship and roster spot Braham would take, the scale would be even. The district court rejected this argument because it concluded that the NCAA "failed to present any evidence of a fixed roster demonstrating proof of actual displacement" and in fact "conceded at the Hearing that there is now no longer a cap on roster limits." 1-ER-18.

The district court erred in two respects. First, it held the NCAA to the standard of submitting evidence while accepting all of Braham's mere allegations at face value. But it was Braham who faced a heightened standard of proof that

required admissible evidence, not the NCAA. *Alston*, 594 U.S. at 97; *Klein*, 381 F. App'x at 726.

Second, the district court mischaracterized the record by asserting "the NCAA failed to present any evidence of a fixed roster demonstrating proof of actual displacement" and "conceded at the hearing that there is now no longer a cap on roster limits." 1-ER-18. At oral argument, the NCAA noted that the *House* settlement changed the NCAA rules regarding scholarships and roster limits, capping the former and uncapping the latter. 2-ER-111 at 24:14-21. The NCAA made the common-sense point that "even though rosters aren't necessarily capped by the NCAA rules, as a practical matter, football teams are only going to have a certain number of players on their rosters. So, if Mr. Braham gets a spot, it's going to be at the expense of somebody else." 2-ER-111-112 at 24:22-25:2.

Indeed, so long as football games have a limited number of minutes of play and a limited number of players on the field, the presence of athletes like Braham who have used up their eligibility will mean the absence of athletes who have not. It was not for the district court to pick the team.

## CONCLUSION

NCAA Division I member schools establish non-commercial rules that make athletic competition among its members possible, including fundamental rules governing who can compete and for how long. The Five-Year Rule and related

JUCO Eligibility Bylaw ensure that college football is a unique offering, played by student-athletes, whose academic and athletic careers are aligned toward pursuit of a four-year degree. These rules are either immune from antitrust scrutiny or should be approved as procompetitive based upon a quick look analysis.

Braham sought a disfavored mandatory injunction to suspend these rules. Braham bore a heightened standard of proof to obtain such extraordinary relief. The district court granted Braham relief without holding him to this heightened standard. The district court adopted arguments that would logically result in the invalidation of all eligibility rules. And the district court erred at every stage of the three-step rule of reason analysis.

The NCAA respectfully requests that this Court reverse the preliminary injunction issued by the district court.

Respectfully submitted this 8th day of September, 2025.

DORSEY & WHITNEY LLP

*s/ Ben D. Kappelman*
DORSEY & WHITNEY LLP
Ben D. Kappelman
F. Matthew Ralph
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600

WILKINSON STEKLOFF LLP
Rakesh Kilaru
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4046

NAYLOR & BRASTER
John M. Naylor
Nevada Bar No. 5435
10100 W. Charleston Blvd., Suite 120
Las Vegas, NV 89135

*Attorneys for Defendant-Appellant*
*National Collegiate Athletic*
*Association*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** ___25-5040_

I am the attorney or self-represented party.

**This brief contains 12,277 words,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __*s/ Ben D. Kappelman*_____ **Date** _09/08/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

54

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 8, 2025.

I certify that all participants in the case are registered users and that service will be accomplished by the appellate CM/ECF system.

*s/ Ben D. Kappelman*
DORSEY & WHITNEY